JOHNSON, Respondent, v. CHEMICAL SUPPLY COMPANY, Appellant.  [Case No. 171.]

DUDKA, Special Administrator, Respondent, v. CHEMICAL SUPPLY COMPANY, Appellant.  [Case No. 172.]

*January 30—February 27, 1968.*

For the appellant there was a brief and oral argument by *Emmet McCarthy* of Marinette.

For the respondents there was a brief by *Kopish, Miron & Boyle* and *William P. Kopish,* all of Marinette, and oral argument by *William P. Kopish.*

ROBERT W. HANSEN, J.   Was the defendant corporation causally negligent by reason of its failure to deliver toluol in containers completely painted a bright red color pursuant to sec. 168.11 (2), Stats?

At all times material to this case, sec. 168.11 (2), Stats., read as follows:

"(2) No person shall deliver, place, receive or store any gasoline (or a like product of petroleum which has a flash point of less than 110° F. when tested in the Tagliabue closed cup tester) in any visible container . . . unless such visible container is completley painted a bright red color and the name of the product contained therein conspicuously stenciled in English thereon . . . ."

This statute clearly was enacted to protect the public safety.[1] It follows that, if the defendant violated it by not painting its toluol drums a bright red color, such violations constitute negligence per se.[2]

The trial court found toluol to be ". . . a like product of petroleum which has a flash point of less than 110° . . ." which is subject to the provisions of sec. 168.11 (2), Stats. We find this to be a proper construction of this statute as it then existed, applied to the product, toluol.

---

[1] In *Wadhams Oil Co. v. Tracy* (1909), 141 Wis. 150, 123 N. W. 785, this court stated at page 156: "The manifest purposes of the enactment here (Ch. 168) are to conserve individual members of society and their property from physical harm . . . ." *See also Knecht v. Kenyon* (1923), 179 Wis. 523, 192 N. W. 82.

[2] *Kalkopf v. Donald Sales & Mfg. Co.* (1967), 33 Wis. 2d 247, 255, 256, 147 N. W. 2d 277.

The term "toluol" is interchangeable with the term "toluene," defined in Webster's Third New International Dictionary (1966 ed., Unabridged) as:

". . . a light mobile liquid aromatic hydrocarbon $C_6H_5CH_3$ that resembles benzene but is less volatile, less flammable, and less toxic, that was obtained originally by distilling balsam of tolu, that is produced commercially from light oils from coke-oven gas and coal tar and especially since World War II from petroleum (as by dehydrogenation of methyl-cyclohexane or by the reforming of dimethylcyclopentane), and that is used chiefly as a solvent, as a raw material for trinitrotoluene, dyes, pharmaceuticals, and other organic compounds, and as a blending agent for gasoline especially for use in aviation because of its high antiknock property—called also *methylbenzene.*"

The wording of the statute, far more than the words of the dictionary, emphasizes the factor of volatility—with an absolute ceiling of 110°—in determining what petroleum products are "like" gasoline. During the trial in this case it was established that toluol has a flash point of 40° F., well below the statutorily prescribed cut-off point of 110° F. During trial it was also established that, since World War II, 80 to 90 percent of all toluol produced is derived from petroleum. The trial court's determination that toluol is: (1) A product of petroleum; (2) with a flash point of less than 110° F.; and (3) "like" gasoline, appears strengthened by the legislative history of the statute in question.

In 1901, the legislature enacted the first law regulating the color of the packaging of petroleum products.[3] It provided that gasoline was to be delivered in cans painted red and kerosene was not to be delivered in cans painted red. In 1909, the law was amended to provide that "gasoline, benzine, or naphtha and other like products

---

[3] Laws of 1901, ch. 466, sec. 9.

of petroleum" were to be delivered only in red cans.[4] This phraseology remained the same until 1953 when the law was amended to provide, as it did at the time of the accident, that gasoline or "a like product of petroleum which has a flash point of less than 110° F." must be delivered in a container painted a bright red color.[5]

The effect of the 1909 amendment was to require red containers for benzine, naphtha and like products along with gasoline. Going back to Webster's (1966 ed., Unabridged) we find that benzine is ". . . any of various volatile flammable petroleum distillates that are lighter than kerosene . . . used especially as solvents or as motor fuels," and that naphtha is "petroleum especially when occurring in any of its more volatile varieties . . . any of various volatile often flammable liquid hydrocarbon mixtures used chiefly as solvents and diluents and as raw materials for conversion to gasoline." High volatility appears to be the shared characteristics of the products to be delivered in red containers. If there was any doubt as to either purpose or test, it vanished with the 1953 amendment. Here the measuring stick of ". . . a flash point of less than 110° F." is clearly set forth. In fact, sub. (3) of sec. 168.11, Stats., with equal clarity provides: "No person shall deliver, place, receive or store any kerosene, diesel fuel or burner oil (or a like product of petroleum which has a flash point of 110° F. or more . . .) in any container which is in any manner painted red . . . ." The legislative mandate is clear. High volatility petroleum products must be delivered in red containers. Low volatility petroleum products must not be delivered in red containers. The flash point of 110° F. determines the dividing line between the two.

It is the volatility of the petroleum product, not its use or uses, that is controlling. Apparently, a different conclusion was reached by the petroleum products division

---

[4] Laws of 1909, ch. 363, sec. 4.
[5] Laws of 1953, ch. 323, sec. 14.

of the state department of taxation. Mr. Herbert Anderson, administrative assistant of this division, testified in chambers that only gasoline is required to be in a red container by the department of taxation. This court is not bound by an erroneous construction of a statute by an administrative agency.[6] Neither was the trial court, and we concur with the statement of the trial court that "The very wording of 168.11 (2) indicates that the statute contemplates its application to other products than gasoline. The words 'or a like product of petroleum' . . . would be wholly unnecessary if the statute applied only to gasoline. . . . It is commonly understood that any red can means danger; means that a highly flammable or explosive product is contained in the can or barrel. In fact, the very purpose of the statute is to so warn. The public has come to understand that any red can contains a dangerous, explosive liquid and will treat such container accordingly." We concur with the reasoning and the result: to wit, the finding that the defendant was negligent per se for failure to conform to the requirements of sec. 168.11 (2), Stats., as it existed at the time of the accident.

What then about the jury finding that the defendant was 100 percent negligent as to Timothy Lindstrom and 65 percent negligent as to Robert Johnson? We begin with the classic rule that when there is any credible evidence which under any reasonable view supports the jury finding, especially when the verdict has the approval of the trial court, it should not be disturbed.[7] However, questions remain. Was the conduct of the late Timothy Lindstrom the proximate, efficient cause of the explosion that caused his death? Was Robert Johnson negligent to a degree equaling or exceeding that of the defendant corporation? Did the acts of Lindstrom and Johnson

[6] *Estate of Smith* (1915), 161 Wis. 588, 155 N. W. 109.
[7] *Ash v. American Family Mut. Ins. Co.* (1967), 33 Wis. 2d 592, 595, 148 N. W. 2d 58.

supersede any negligence of the defendant corporation to produce the harm sustained? Was the harm to both plaintiffs so remote, unusual and extraordinary that the trial court should have absolved the defendant corporation on the grounds of public policy?

The trial judge found that the used toluol barrel, not painted red, and sealed to contain explosive fumes ". . . constituted a time bomb waiting for an opportunity to explode. It is much the same as an unexploded grenade or shell left over from wartime . . . it was a menace to all who dealt with it. Failure to warn of the dangers by painting it red, in my opinion, constituted a continuing negligence, which made the defendant responsible to anyone injured by an explosion of such barrel."

As to Timothy Lindstrom, the analogy made by the trial judge to a time bomb or unexploded grenade is particularly apt. There was nothing to indicate to him that the barrel, converted into a workbench base, contained a dangerous or highly volatile substance. The cautioning message on the top of the barrel had been sealed off by the strip of steel, the top of the improvised workbench. There just was nothing to warn Lindstrom that there would be any untoward consequences resulting from his using the barrel base to strike the beads off his welding gun. The jury found no negligence on the part of Lindstrom. Their finding is upheld.

As to Robert Johnson, the situation is markedly different. In converting the barrel into a workbench base, he had every opportunity to observe the warning legend stenciled on the top of the barrel. By covering this cautionary legend with a strip of steel, he made it impossible for anyone thereafter to observe and be warned of the danger of explosion. It is an inescapable conclusion that Johnson was guilty of negligence. The jury fixed his negligence at 35 percent. A majority of this court finds that this jury finding is not to be overturned, stating again that "The apportionment of negligence is a matter

particularly within the province of the jury, and it will not be upset except in unusual cases in which the court can find, as a matter of law, that the plaintiff's negligence equaled or exceeded that of the defendant." [8] The majority opinion is that this court should not find that Johnson was more negligent than the defendant corporation as a matter of law. On the record, the jury was entitled to conclude that, had the barrel been painted a bright red color, its danger would have been more forcefully brought home to Johnson and to others and deterred the unfortunate use of the barrel as a workbench base.

Appellant urges this court to find that the acts of Lindstrom and Johnson constitute superseding acts absolving the defendant corporation from liability. Johnson's act of converting the barrel into a workbench base and Lindstrom's act of striking the barrel-base with a welding torch do intervene in the sense that they came into active operation in producing the result after the defendant corporation's negligent act had been committed. [9] In determining whether intervening acts are to be found to be superseding causes, this court has adopted the test set forth in the Restatement, *Law of Torts,* 2d.

As to the intervening act of Lindstrom, the jury found no negligence on his part. This finding was approved by the trial court and this court. In regard to whether a nonnegligent intervening act is to be found a superseding cause, sec. 443 of the Restatement, 2 *Torts* 2d provides:

"The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such

---

[8] *Ernst v. Greenwald* (1967), 35 Wis. 2d 763, 773, 151 N. W. 2d 706.

[9] *Bentzler v. Braun* (1967), 34 Wis. 2d 362, 381, 149 N. W. 2d 626.

conduct has been a substantial factor in bringing about." [10]

Testimony established that striking a welding torch against a workbench to knock off beads accumulated on the welding wire was common practice not only in the plant at Marinette but in the welding industry.

Lindstrom's striking the barrel was a normal consequence of a situation which defendant's negligence in failing to paint a barrel red was a substantial factor in bringing about. Had the barrel been red, Lindstrom's behavior would have been abnormal.

Johnson's intervening act was negligent. Of the tests applicable in determining whether intervening negligent acts are to be found superseding causes, the two tests relevant to the present situation appear in Restatement, 2 *Torts* 2d, p. 478, sec. 447:

"The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about if

"(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

"(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted . . . ." [11]

The testimony establishes that Johnson's act of converting the barrel into a workbench base was no isolated incident. It was the common practice to use the barrels

---

[10] Restatement, 2 *Torts* 2d, p. 472, sec. 443. *See Diener v. Heritage Mut. Ins. Co.* (1967), 37 Wis. 2d 411, 155 N. W. 2d 37; *Hatch v. Smail* (1946), 249 Wis. 183, 23 N. W. 2d 460; *Kramer v. Chicago, M., St. P. & P. Ry.* (1937), 226 Wis. 118, 276 N. W. 113.

[11] *See Merlino v. Mutual Service Casualty Ins. Co.* (1964), 23 Wis. 2d 571, 580, 127 N. W. 2d 741.

of defendant corporation for this purpose. The defendant did know that the barrels, with the bungs replaced, were stored in the open area awaiting pickup by defendant's truck. On the record and under the circumstances, the trial judge found Johnson's act not highly extraordinary and obviously held it to be an act that the defendant corporation at the time of its negligent conduct should have realized might occur. A majority of this court concurs in the trial court's ruling that intervening acts in this case do not constitute superseding causes.

Appellant additionally contends that the harm to both plaintiffs was so remote, unusual and extraordinary that the defendant corporation should be absolved from liability on the grounds of public policy. The trial court refused to find, and we concur in his reasoning and result, that this was a case in which " '. . . the injury is too remote from the negligence or too "wholly out of proportion to the culpability of the negligent tort-feasor," or in retrospect it appears too highly extraordinary that the negligence should have brought about the harm . . . .' " [12] In his decision the trial judge stated that ". . . failure to paint this barrel red was negligence which followed that barrel through any subsequent history it might have." In tracing the route of the barrel from its painting to its exploding, we find no considerations of remoteness, disproportion or public policy that would justify excusing the defendant corporation from the consequences of its negligence.

Appellant on appeal raises an additional issue, asserting that the trial court erred in denying its motion to implead Johnson in the Lindstrom case. On February 10, 1967, the trial court granted plaintiffs' motion for judgment on the verdict and denied all of defendant's motions after verdict. On March 6, 1967, defendant moved the

---

[12] *Schilling v. Stockel* (1965), 26 Wis. 2d 525, 532, 133 N. W. 2d 335, quoting from *Colla v. Mandella* (1957), 1 Wis. 2d 594, 598, 85 N. W. 2d 345.

trial court to be permitted to amend its pleadings to implead Robert Johnson in the Lindstrom case for the purpose of permitting the defendant to cross-complain against Johnson for contribution of a percentage of Lindstrom's damages assessed against the defendant corporation. The trial court denied the motion as not being timely. The issue of Johnson's negligence being causal in the Lindstrom case had not been submitted to the jury. Sec. 269.44, Stats., provides the trial court with wide discretion as to amendment of pleadings. It has been held, however, that it would be an abuse of discretion to permit an amendment which would unfairly deprive opposing counsel of timely opportunity to meet the issue created by the amendment.[13] Here, if the motion to implead had been granted before trial, plaintiffs' counsel could not well have represented both plaintiffs because of the conflict of interest created. It was no abuse of discretion to deny the motion to implead made after the jury's verdict and after the trial court's ruling on motions after verdict.

As a postscript to this decision, mention is made of the fact that, after the decision of the trial court in this case, the state department of taxation proposed an amendment to sec. 168.11 (2), Stats. The Wisconsin legislature enacted the proposed amendment and, effective November 10, 1967, it is clear that toluol is not to be delivered in containers painted a bright red color.[14] This is now the

---

[13] *Wipfli v. Martin* (1967), 34 Wis. 2d 169, 174, 148 N. W. 2d 674.

[14] Effective November 10, 1967, sec. 168.11 (2), Stats., provides: "(2) No person shall deliver, place, receive or store in any visible container: (1) any gasoline; (2) any product of petroleum regardless of name meeting the gasoline specifications set forth in s. 168.04 (1); or (3) any product of petroleum commonly or commercially used as a fuel in a spark-ignition internal combustion engine or as a fuel for any appliance or device if such product of petroleum has a flash point of less than 110° F. when

law in Wisconsin. However, it is a new law and is not to be given retroactive applicability. Plaintiffs are entitled to the application to the facts in their case of the law as it existed at the time of the accident. It is not the law as originally enacted in 1901, nor certainly the law as enacted in 1967, that is to be applied. The questions of public policy involved in amending, repealing or recreating a particular statute are to be debated, discussed and determined as part of the legislative process. That is the legislative function. Short of constitutional questions, it is the judicial function, in a given case and at a given time, to apply the law as it then is to the facts as they then are. The trial jury found the facts. The trial judge correctly applied the law then in effect. The conclusions they reached are sustained.

*By the Court.*—Judgment affirmed.

HALLOWS, C. J., dissents.

---

tested in the Tagliabue closed cup tester unless the container (a) is constructed of sound metal or of equally sound non-flammable material meeting the requirements of the industrial commission's flammable and combustible liquids code, (b) is substantially a bright red color, and (c) has the common name of the product clearly labeled or painted on it. . . ."